**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 7 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DEVIN ESPINOZA,

Defendant-Appellant.

No. 01-4240

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2:00-CR-56-02-ST)**

---

Edward K. Brass, Salt Lake City, Utah, for Defendant-Appellant.

Diana Hagen, Assistant United States Attorney (Paul M. Warner, United States Attorney, with her on the brief), Salt Lake City, Utah, for Plaintiff-Appellee.

---

Before **LUCERO** , **HARTZ** , and **McCONNELL** , Circuit Judges.

---

**HARTZ** , Circuit Judge.

---

Defendant Devin C. Espinoza appeals his conviction and sentence for armed bank robbery in violation of 18 U.S.C. § 2113(a) & (d) and 18 U.S.C. § 2. He contends that (1) the trial judge failed to dispel the jury's confusion when

responding to a jury question during deliberations, (2) the evidence of guilt was insufficient, and (3) his offense level under the Sentencing Guidelines was improperly adjusted upward on the basis of unreliable hearsay evidence. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm Defendant's conviction and sentence.

I. **Background**

A. *Factual Background*

On the morning of January 20, 2000, two robbers armed with handguns, and wearing coveralls, ski masks, and gloves, entered a branch of the U.S. Bank in Holladay, Utah. One of the robbers, later identified as Omar G. Sanchez, stayed in the bank's lobby area and watched the doors. The other walked toward the tellers' station, pointing his gun at teller Sherri Bird. He struggled to open the gate to the tellers' station until a second teller, Brandy Sawyer, unlocked it.

As he continued to point his gun at Ms. Bird, she opened her drawer, and he emptied the contents into a backpack. Unbeknownst to the robber, the drawer's contents included a dye pack. At the next drawer Ms. Sawyer emptied more money into the backpack. While searching the area for additional money, the robber was interrupted by Mr. Sanchez, who yelled from the lobby, "Come on, we're taking too long." The robbers fled the bank with $16,966.

A witness in the bank's parking lot saw a black extended-cab Toyota Tundra pickup truck speed away from the lot immediately after the robbery. About the same time, a worker at a cemetery near the bank heard tires squealing, looked up, and saw a dye pack explode in a black pickup.

Later that day the black pickup was found abandoned in a nearby church parking lot. On the morning of the robbery a person who lived next to the church had seen two men leave a green Chevrolet Blazer in the lot. (Evidence indicated that Mr. Sanchez owned a green Blazer.) That Blazer was gone when the black pickup was discovered. The pickup's interior had pink and orange stains with the same chemical composition as a bank dye pack.

At trial Ms. Bird, the bank teller, identified Defendant as the robber who had pointed the gun at her. She testified that she had seen him when he entered the gate and approached her drawer, when he was taking the money from the other teller, and when he was looking around for additional money. She explained that she was able to identify Defendant based on his eyes and the shape of his face, despite his wearing a ski mask.

Also testifying was a customer who witnessed the robbery from the bank's drive-thru window. She identified Defendant's photograph in a photo line-up as one of two that resembled the robber. She noted that the robber in the tellers' station was taller and thinner than the robber who waited in the lobby of the bank

(Mr. Sanchez). (Defendant is, in fact, taller and thinner than Mr. Sanchez.) She also indicated that she could see the robber's brow and long face.

Two eyewitnesses outside the bank provided corroborating identifications of Defendant. One, the cemetery worker who saw the dye pack explode in the black pickup, identified Defendant's photo in a photo line-up as one of two that resembled the driver. He testified that when the dye pack exploded, smoke began to pour out of the truck and the two occupants stuck their unmasked heads out their doors, at which point he could see their faces.

The other eyewitness, an employee at a nearby nursery who saw a black pickup drive by after the robbery, selected two possible suspects from a photo line-up as resembling an occupant in the vehicle; one of the two photos depicted Defendant. Unlike the cemetery worker, however, she identified him as the passenger in the vehicle.

In addition to the eyewitness testimony, there was evidence tying Defendant to the black pickup, the purchase of coveralls like those used in the robbery, dye-stained money, and other dye-stained items. The black pickup had been stolen from Kimberly Jensen on January 17, 2000, when she went inside her babysitter's house to drop off her child, leaving her keys, purse, wallet, checkbook, and identification in the truck. Defendant, who lived less than a mile from the babysitter's house, was later seen carrying Ms. Jensen's wallet, including her

-4-

checkbook, identification, and a credit card. On the day Ms. Jensen's pickup was stolen, when Defendant and Mr. Sanchez were at the home of their friend, Christine Rollins, Mr. Sanchez asked Defendant for the wallet so that he could give it to Ms. Rollins, who was experienced in forging and cashing stolen checks. Defendant informed Ms. Rollins that the checks were "fresh" from a stolen vehicle. Later that day the three friends—Defendant, Mr. Sanchez, and Ms. Rollins—used the stolen checks at numerous stores. As they were so engaged, Defendant informed Ms. Rollins that he had a "little black truck" but that it was broken down.

There was also evidence that Defendant purchased coveralls similar to those used in the robbery. The day before the robbery, three pairs of coveralls were purchased from the General Army Navy Store. A recording from the store's security camera showed Defendant buying the coveralls, paying in cash. The receipt for that purchase was later found in Mr. Sanchez's home, with Defendant's fingerprint on it. The bank tellers who witnessed the robbery identified the coveralls purchased at the General Army Navy Store as of the same type as those worn by the robbers.

Finally, evidence linked Defendant to the stolen money. Defendant's brother testified that Defendant gave him and two other siblings money that was red or pink on the edges. Defendant told them that he had spilled Kool-Aid on

the bills. Moreover, an FBI agent who searched Defendant's bedroom discovered an ironing board cover and pad with red and pink stains on them. A later test indicated that the stains were chemically consistent with stains caused by a bank dye pack. Expert testimony indicated that an item would have to be thoroughly saturated with dye for it to transfer dye to items such as the ironing board cover and pad.

Defendant called Mr. Sanchez as his sole witness. A year earlier Mr. Sanchez had pleaded guilty to the robbery of the U.S. Bank, but he had repeatedly refused to name his accomplice. At Defendant's trial Mr. Sanchez insisted that Defendant had not been involved. He testified that he had given Defendant money to buy coveralls but had never told Defendant how they were to be used. He also testified that after the robbery he had given Defendant between $200 and $400 in dye-stained bills, which he had told Defendant to wash, but that he had never told Defendant how he had gotten the money. Mr. Sanchez also indicated that he had purchased the guns used in the robbery, and that the guns had been thrown in the river after the robbery.

According to Mr. Sanchez, Russell Thornwall (also known as "Puppet") was the person who robbed the bank with him. Mr. Thornwall died a year before Defendant's trial. Mr. Sanchez testified that the reason he had not previously named Mr. Thornwall as his accomplice was that Mr. Thornwall had still been

alive when earlier inquiries had been made; Mr. Sanchez had not, however, come forward to clear Defendant's name during the year between Mr. Thornwall's death and Defendant's trial.

B. *Court Proceedings*

Defendant was charged with one count of committing and aiding and abetting an armed bank robbery, in violation of 18 U.S.C. § 2113(a) & (d) and 18 U.S.C. § 2 (Count I), and one count of committing and aiding and abetting the offense of using or brandishing a firearm during the robbery, in violation of 18 U.S.C. § 924 (c) and 18 U.S.C. § 2 (Count II). A jury trial was conducted from June 25 to June 29, 2001.

During deliberations the jury sent a note to the trial judge asking whether it could convict Defendant on the armed robbery count without convicting him on the firearm count. After the question the note said: "We consider it possible that while he aided and abetted the commission of the crime, there is not enough evidence to determine that the defendant was instrumental in procuring weapons or planning their use." R., Vol. I, Doc. 108. The judge, without any objection from the parties, answered "yes" to the question and reminded the jury to consider all previous instructions. Four hours later the jury rendered its verdict: Defendant was found guilty of armed robbery, but not guilty of using or brandishing a firearm during the robbery.

The probation office presentence report recommended that the court increase Defendant's offense level by two levels for obstruction of justice under USSG § 3E1.1, because Defendant had colluded with Mr. Sanchez to present false testimony. Evidence of the collusion came from an unidentified informant who claimed to have spoken with Mr. Sanchez while both were incarcerated. The Court found the evidence reliable and imposed the enhancement. Defendant was sentenced to 200 months' imprisonment.

## II. **Discussion**

On appeal Defendant claims three errors: (1) the trial judge's response to the jury's note was incomplete and misleading; (2) the evidence was insufficient to support the guilty verdict for armed bank robbery; and (3) the obstruction-of-justice enhancement was improper because it was based on unreliable evidence. We address and reject each argument in turn.

### A. *Response to jury's note*

The jury commenced its deliberations at 11:20 a.m. on June 29, 2001. At 4:10 p.m. the jury sent the following note to the judge:

> If we determine that there is enough circumstantial evidence to find the defendant guilty of at least aiding and abetting the commission of the bank robbery, but that the evidence is not sufficient to determine that he was in the bank at the time of the robbery, can we find the defendant guilty of count I [armed robbery] but not Count II [using a firearm during the robbery]?

We consider it possible that while he aided and abetted the commission of the crime, there is not enough evidence to determine that the defendant was instrumental in procuring weapons or planning their use.

R. Vol. I, Doc. 108.

The judge met with the attorneys and indicated that his intended response to the jury's question was simply "yes." Defendant's attorney raised no objections and made no suggestions.

The judge then responded to the jury's note as follows:

(1) Members of the jury, I have received a note from you that says:

[The jury's note was repeated in full.]

(2) Let me respond by instructing you as follows:

Yes.

(3) Keep in mind that you should consider what I have just said together with all the other instructions that I gave you earlier. All of these instructions are important, and you should consider them together as a whole.

R., Vol. 1, Doc. 108. At 8:50 p.m.—about four and a half hours after it sent the note—the jury returned a verdict of guilty on Count I (armed robbery), and not guilty on Count II (using or brandishing a firearm).

Defendant does not contest the correctness of the court's response to the jury's question. Focusing on the sentence following the question, however, he contends that the judge should have provided further clarification to the jury.

First, he contends that a portion of that sentence—"we consider it *possible* that while [Defendant] aided and abetted the commission of the crime," R., Vol. 1, Doc. 108 (emphasis added)—suggests that the jury erroneously believed that it could convict Defendant on a mere *possibility*. Second, he argues that the jury's apparent doubt that Defendant "was instrumental in procuring weapons or planning their use" would have made it improper for it to convict him of aiding and abetting *armed* robbery, and the jury should have been so informed.

At trial, however, Defendant neither objected to the judge's proposed response to the jury's question, nor asked him to give additional clarifying instructions. Accordingly, we review the response only for plain error. *See United States v. Fabiano*, 169 F.3d 1299, 1303 (10th Cir. 1999). "Under this standard, Defendant must show: (1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affect[s] substantial rights. If these three requirements are met, then we may exercise discretion to correct the error if it seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal citations and quotation marks omitted; brackets in original).

Defendant has failed to show plain error. To be sure, "'[w]hen a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy.'" *United States v. Zimmerman*, 943 F.2d 1204, 1213 (10th Cir. 1991)

(quoting *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946)).  But that does not mean that the trial judge must always reinvent the wheel, crafting a new instruction when the original instructions are sufficiently clear.  The judge may be properly concerned that a new instruction may itself introduce error or distort the instructions as a whole by overemphasizing a particular instruction.  Here, after answering the jury's one explicit question, the judge reminded the jury that it must consider the answer in light of the other instructions that had previously been given.  In doing so, the judge referred the jury to instructions that address the very matters of concern to Defendant—instructions on the elements of the crimes charged and on the burden of persuasion.  Defendant does not contest the correctness of those previously given instructions or suggest that they were confusing.  We find no plain error in the trial judge's response to the jury's note.

B. ***Sufficiency of the evidence***

In reviewing the sufficiency of the evidence to support a conviction, we view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the jury's verdict.  *United States v. Lang*, 81 F.3d 955, 962 (10th Cir. 1996).  We will reverse the verdict only if no rational jury could have found Defendant guilty beyond a reasonable doubt.  *See id.*

The jury was instructed that it could convict Defendant of armed bank robbery as either a principal or an aider and abettor.  The verdict form did not

distinguish between the two theories of liability. Accordingly, when the jury

returned the form, denoting that Defendant was guilty of armed bank robbery, it

could not be determined which theory of liability served as the basis for the

conviction. In such a circumstance, we will "affirm the conviction[] if the

government presented sufficient proof of either the substantive offense or of

aiding and abetting." *United States v. Langston*, 970 F.2d 692, 706 (10th Cir.

1992).

The evidence was sufficient to support Defendant's conviction for armed

bank robbery as a principal. There was eyewitness testimony: the bank teller,

Ms. Bird, testified that Defendant was the robber who came into the tellers'

station, pointed the gun at her, and took money from the drawers; the witness who

watched from the drive-thru identified Defendant's photograph as one of two that

resembled the robber in the tellers' station; and the cemetery worker identified

Defendant's photograph as one of two that resembled the man driving the black

pickup when the dye pack exploded. In addition, it was uncontested that

Defendant was a close associate of an admitted participant in the robbery, and

there was evidence that Defendant had purchased the coveralls worn in the

robbery, had been involved in the theft of the black pickup used in the robbery,

and had possessed dye-stained money and a dye-stained ironing board pad and

cover. Given this evidence, it is not surprising that Defendant does not contest on

appeal the sufficiency of the evidence offered in support of his guilt as a principal.

Defendant argues, rather, that the jury convicted him as an aider and abettor—not as a principal—and that there was insufficient evidence to support that conviction. He provides two reasons for concluding that he was convicted as an aider and abettor: (1) the acquittal on Count II—the charge of using or brandishing a firearm during the robbery—evidences the jury's belief that he was not one of the armed robbers; and (2) the jury indicated in its note to the judge that it believed that Defendant was not one of the robbers, saying, "the evidence is not sufficient to determine that [Defendant] was in the bank at the time of the robbery." We reject both arguments.

First, we reject Defendant's argument that the jury could not have convicted him as a principal on the armed-robbery count because it acquitted him of using a firearm during the robbery. We appreciate the appeal of this argument; it would seem inconsistent for the jury to conclude that Defendant was one of the armed robbers in the bank, while also concluding that he did not use or brandish a firearm during the robbery. There are sound reasons, however, not to concern ourselves with the consistency of jury verdicts in criminal cases. In *United States v. Powell*, 469 U.S. 57, 64–66 (1984), the Supreme Court explained:

> [W]here truly inconsistent verdicts have been reached, the most that can be said . . . is that the verdict shows that either in the acquittal or

the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. The rule that the defendant may not upset such a verdict embodies a prudent acknowledgment of a number of factors. *First, . . . inconsistent verdicts . . . should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense.* But in such situations the Government has no recourse if it wishes to correct the jury's error; the Government is precluded from appealing or otherwise upsetting such an acquittal by the Constitution's Double Jeopardy Clause.

*Inconsistent verdicts therefore present a situation where error, in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored.* Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course. . . . *[T]he possibility that the inconsistent verdicts may favor the criminal defendant as well as the Government militates against review of such convictions at the defendant's behest. . . .* [S]uch inconsistencies often are a product of jury lenity.

. . . .

*We also reject, as imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them. Such an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake.*

*Id.* (internal citations, quotation marks, footnote, and original brackets omitted;

emphasis added).

-14-

In the present case we can only speculate regarding why the jury acquitted Defendant on the firearm count. Defendant may be correct that the jury was not convinced that he was in the bank during the robbery. On the other hand, the jury may also have acquitted because of "mistake, compromise, or lenity." *Id.* at 65. We cannot properly draw from the acquittal on Count II any inference regarding the basis of the jury's conviction on Count I.

For similar reasons we also refuse to consider the jury's note to the trial judge as evidence of how the jury arrived at its verdict on Count I. The jury speaks through its verdict. As Professor Wigmore stated:

> The jurors' deliberations during retirement, their expressions, arguments, motives and beliefs represent that state of mind which must precede every legal act and is in itself of no jural consequence. The verdict as finally agreed upon and pronounced in court by the jurors must be taken as the sole embodiment of the jury's act. Hence it stands irrespective of what led up to it in the privacy of the jury room, precisely as the prior negotiations of the parties to a contract disappear from legal consideration when once the final agreement is reduced to writing and signed.

8 Wigmore on Evidence § 2348 (John T. McNaughton ed., 1961) (internal citation and emphasis omitted). The second paragraph of the jury's note, which expressed doubt about Defendant's presence in the bank, was not a verdict. Indeed, the jury was only about halfway through its deliberations when it delivered the note. Further discussion may have changed minds. And we cannot even be sure that the note expressed a jury consensus at the time it was written. It may have

represented an effort to accommodate a minority, or even a single member, of the jury.

To clarify that matter would require an inquiry into jury deliberations that is prohibited by Fed. R. Evid. 606(b), which states:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Even if the rule by its terms does not apply to the jury's note to the judge, the underlying principle does: Courts are not to examine the jury's internal deliberations for the purpose of questioning its verdict. "[A]n attempt to use the jury's note to probe its process of deliberation and find out how and why the jury reached its verdict . . . is the one form of attack on a verdict that has always been forbidden in Anglo-American criminal law." *United States v. D'Angelo*, 598 F.2d 1002, 1004 (5th Cir. 1979).

Accordingly, we cannot infer from the note that the jury convicted Defendant on Count I as an aider and abettor. Hence, there is no need to consider his sufficiency-of-the-evidence arguments regarding that theory of liability.

-16-

Because there was more than sufficient evidence to support his conviction for armed bank robbery as a principal, we affirm his conviction for that crime.

## C. *Obstruction-of-justice enhancement*

Finally, we consider whether Defendant's sentence was properly adjusted upward two levels for obstruction of justice under USSG § 3C1.1. That section states:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

The probation office recommended that Defendant's offense level be increased two levels because he obstructed justice by colluding with Mr. Sanchez to present false testimony. The presentence report stated:

> Information outlined in a report from the FBI indicates that the defendant telephonically conversed with the girlfriend of Omar Sanchez and arrangements were made for Mr. Sanchez to give false testimony at the defendant's trial. The FBI report identifies an individual who was serving time with Mr. Sanchez at the Davis County Jail. During this time, Mr. Sanchez admitted that the robbery was committed by three people: Omar Sanchez, the defendant, and "Puppet." Mr. Sanchez further admitted that he and [Defendant] went into the bank and that [Defendant] was the robber who went behind the teller station and got the money. Mr. Sanchez also told the informant that Mr. Sanchez's girlfriend, Erica Garcia, was supposed to have gotten rid of the evidence of the robbery but failed to do so and that Ms. Garcia was in touch with [Defendant] and had participated in the plan to present a false defense.

R., Vol. XII at 6, ¶ 21.

Defendant objected to the recommendation, arguing that the information in the presentence report was unreliable because the prosecution had not disclosed the FBI Report, the identity of the informant, or the informant's criminal record. He complained that the motives of the informant had not been explored or tested. He also asserted that the report was "false on its face in that the informant claims three people perpetrated the robbery, while witnesses identified two." R., Vol. I, Doc. 124 ¶ 1.

At the sentencing hearing the prosecution explained that its refusals to disclose the report and the informant's identity were to protect the informant. It also indicated, however, that an FBI Report had been prepared on the informant and that the report could be made available to defense counsel upon request. In open court the prosecution then made the following proffer from the report:

> This individual, the inmate, met Omar Sanchez on or about February of 2000 when the inmate was incarcerated for a parole violation and arrested and placed at the Davis County jail. After processing -- I'm reading now from the [report], Your Honor. After processing for a couple of days, the inmate was moved from 1 unit to D unit where he met Sanchez and others. . . . The inmate typically played pinochle from nine a.m. to ten p.m. with Sanchez, [and two other inmates] . . . . The inmate describes how, quote, me and Omar got kind of close, unquote, and he began to discuss a bank robbery in which he was involved. He robbed the bank with two other persons, [Defendant] and another person who Sanchez referred to as, quote, Puppet. Sanchez and [Defendant] went inside the bank while Puppet stayed in the car. Puppet was the driver. Sanchez provided the handguns used in the bank and [Defendant] purchased the jumpsuits,

masks, and gloves used during the robbery. Sanchez was arrested not long after the robbery. Sanchez informed [Defendant] and Puppet that Sanchez would, quote, take the hit for them, unquote, in that he would take the blame for the robbery so the other two, [Defendant] and Puppet, could go free. [Defendant] was in ADC, the Salt Lake County jail, and was going to go pro se because Sanchez was going to take the rap. Sanchez and [Defendant] both entered the bank with handguns, one of the two watched the people while the other got the money. After leaving the bank, the dye pack activated staining clothing and other items.

. . . .

One vehicle used in the robbery was a four-wheel drive borrowed or obtained elsewhere. This four-wheel drive, description unknown, was not Sanchez's.

After the robbery they threw the guns in the Jordan River.

[Defendant] bought the jumpsuits with money given to [him] by Sanchez. [Defendant] also obtained gloves and masks at Sanchez's directions. Sanchez, quote, got the guns, unquote, and Puppet drove. . . . Sanchez also mentioned a stolen checkbook. Sanchez described how he was going to be, quote, [Defendant's] key witness, unquote, in a trial occurring in a few weeks. Sanchez was going to, quote, get [Defendant] off, unquote, because Sanchez had nothing to lose and already had gotten ten years and eight months. Sanchez also stated that, quote, [Defendant] calls [Sanchez's girlfriend] all the time, unquote.

R., Vol. XI at 20-22.

The anonymous informant also claimed to have met Defendant when both

men were in the holding cell in the Federal courthouse. With respect to this

meeting the prosecution's proffer added:

The inmate told [Defendant] that he knew Sanchez from the Davis County jail. [Defendant] told the inmate that Sanchez was going to

-19-

be his, quote, key witness and the U.S. District Attorney didn't have enough evidence to convict him, unquote. [Defendant] said he did buy the, quote, jumpsuits, unquote, and that Sanchez was going to testify that Sanchez gave [Defendant] the money to buy the jumpsuits and that Sanchez didn't tell [Defendant] what the jumpsuits' purpose was. [Defendant] also told the inmate that, quote, Sanchez was his key witness, unquote.

*Id*. at 23.

The prosecution argued that the informant's statements should be considered reliable because there was no media coverage of Defendant's case, making it impossible for the informant to have learned of the robbery's details from any source other than the participants. Also corroborating the report was evidence that the informant and Sanchez were housed together twice: first between February 16 and March 20, 2001, and then between June 15 and July 12, 2001, although there was no confirmation that the informant and Defendant had ever shared a holding cell.

Defendant maintained his objections at the sentencing hearing, chiefly arguing that he should be able to cross-examine the informant on his motives for making the statements to the FBI and on the credibility of his statements. Other than noting that the informant mentioned three robbers, when all other witnesses referred to only two robbers, Defendant did not specifically challenge the factual accuracy of the report. Indeed, when the judge asked Defendant's counsel at the beginning of the sentencing hearing whether there are "any factual inaccuracies

-20-

that need to be dealt with at this time," R., Vol. XI at 15, counsel responded, "No. Our complaints are legal, Judge." *Id.* Also, although early in the sentencing hearing Defendant's counsel stated that "we don't have the benefit of this report, we don't know who prepared the report, [and] we don't know what the motive of the person who prepared the report might be," *id.* at 18, he apparently declined the government's subsequent offer to let him look at the FBI report, and did not request testimony from the FBI agent who prepared it.

The judge found by a preponderance of the evidence that there was sufficient evidence to justify the two-level enhancement for obstruction of justice.

On appeal Defendant contends that the judge erred as a matter of law in considering the unreliable informant hearsay and that he made a clearly erroneous factual finding of obstruction of justice. "[W]e review the district court's factual determinations concerning the obstruction of justice enhancement for clear error only." *United States v. Hankins*, 127 F.3d 932, 934 (10th Cir. 1997). "Our review of the district court's legal interpretation of the sentencing guidelines, however, is de novo." *Id.*

Defendant is largely correct when he notes that the sole evidence of the collusion with Mr. Sanchez came "from a jailhouse informant who was never identified, and never brought into court for confrontation or cross-examination, whose account of the robbery was allegedly based on hearsay statements from

Sanchez, and vastly different from the accounts at trial, and who was providing this information in hopes of reducing his own liability for his criminal conduct." Aplt. Br. at 48-49. Nevertheless, we reject Defendant's argument that the hearsay was too unreliable to be considered. USSG § 6A1.3 states: "In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." The commentary to that section specifically provides that "[r]eliable hearsay evidence may be considered," and that "[o]ut-of-court declarations by an unidentified informant may be considered where there is good cause for the non-disclosure of the informant's identity and there is sufficient corroboration by other means." USSG § 6A1.3, comment. Here, Defendant does not dispute that the prosecution had good cause for not disclosing the informant's identity. Thus, the only issue is whether the informant's information was corroborated and reliable. We conclude that it was.

First, the informant had the opportunity to talk to Mr. Sanchez. Responses to the judge's inquiries indicated that the informant and Mr. Sanchez were housed together twice—between February 16 and March 20, 2001, and between June 15 and July 12, 2001.

Second, the trial received no publicity, making it highly unlikely that the informant could have learned of the details he described unless he had talked to Mr. Sanchez. Much of the informant's information matched Mr. Sanchez's testimony, including (1) "Puppet" was involved; (2) Mr. Sanchez bought the guns; (3) the guns were thrown in the river after the robbery; and (4) Defendant was sent to buy the coveralls but Mr. Sanchez would testify that Defendant did not know why he was buying them. The informant also exhibited knowledge of other trial details, including that Mr. Sanchez was to be Defendant's primary witness, that there was a stolen checkbook connected to the crime, that both robbers had handguns, that a dye pack exploded after the robbers left the bank, that a vehicle used in the robbery had four-wheel drive, and that one of the robbers watched the door while the other got the money.

Defendant did little to challenge the reliability of the information. He focused on only one specific discrepancy—the fact that the informant referred to three people being involved in the robbery, while all other witnesses mentioned only two—and rested primarily on his contention that the informant's desire to curry favor with prosecutors gave him a strong motive to lie. He did not challenge any other facts. He never contested the accuracy of the FBI report. He declined the offer to let his lawyer look at the report. And he did not request that the FBI agent who prepared the report testify.

After hearing all the evidence and argument presented at the sentencing hearing, the judge expressed his conclusion:

> The Court will make the following finding, that case law dictates that if factual statements made in the presentence report are disputed, that I cannot rely upon them by themselves. Based upon the representations made by [the Assistant U.S. Attorney] and [the probation officer], which would indicate that the unnamed informant in this case would have had the opportunity to meet with and discuss this case with Mr. Sanchez on the dates that we have already identified in the Davis County jail, a possibility in the Salt Lake County jail, as well as the representation that he, the unnamed informant, met with Mr. Sanchez at least once if not twice here in this courthouse's holding facility, and based upon the degree of knowledge of the case represented by this individual, including matters such as the fact that [Defendant] did intend, at least for a period of time, to proceed pro se, facts such as the use of the four-wheel drive, the checkbooks, and other facts represented, the Court finds that by a preponderance of the evidence there is sufficient evidence to justify the two-level enhancement found in paragraph 30 of the presentence report.

R., Vol. XI at 30-31.

We hold that the judge could properly determine that the informant's statement was sufficiently reliable to be considered, *see United States v. Reid*, 911 F.2d 1456, 1463-64 (10th Cir. 1990), and then could properly find that the evidence supported the obstruction-of-justice enhancement. We certainly could not conclude that those rulings were clearly in error. *See Hankins*, 127 F.3d at 934. Accordingly, we affirm the upward adjustment of Defendant's offense level for obstruction of justice.

III. **Conclusion**

We AFFIRM the judgment and sentence of the district court.