**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 14, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MAURICE KARIUKI GITA WAWERU,

Defendant - Appellant.

No. 13-3292
(D.C. No. 6:13-CR-10044-MLB-1)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **O'BRIEN**, and **HOLMES**, Circuit Judges.

Maurice Kariuki Gita Waweru, a citizen of Kenya, was ordered to be removed from the United States. Apparently he found that to be unsatisfactory. He twice refused to provide the necessary fingerprint on the required immigration form and aggressively raised his fists to immigration agents. Because he did not hit the agents or even take a swing at them, he claims his conduct did not constitute "forcibly . . . resist[ing],

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished). *Id.*

oppos[ing], imped[ing], . . . or interfer[ing] with" federal agents in violation of 18 U.S.C. § 111(a)(1). The jury was not persuaded. Neither are we. We affirm.

## I. BACKGROUND

The facts, viewed in the light most favorable to the jury's verdict, *see United States v. Espinoza*, 338 F.3d 1140, 1146-47 (10th Cir. 2003), reveal the following. Waweru came to the United States in July 2001 on a professional athlete (cycling) visa. When the visa expired in October 2001, he did not leave. Instead, he moved to Wichita, Kansas, married (twice), and had children. In 2008 or 2009, immigration authorities initiated removal proceedings against him. Those proceedings ultimately led to a final order of removal.

In order to effectuate a final order of removal, Immigration and Customs Enforcement (ICE) agents are required to complete a Warrant of Removal, also known as an I-205. The removable person is asked to sign the form and affix a fingerprint to it. While the signature of the removable person is optional, the fingerprint is not.

ICE agents attempted to obtain Waweru's signature and fingerprint on an I-205 on two occasions. On January 7, 2013, Agents Andrew Martin and Timothy Zwetow traveled to the Butler County Jail, in El Dorado, Kansas, where Waweru was being detained.[1] Their plan was to pick him up, transport him to the ICE office in Wichita,

---

[1] The federal government contracts with local jails, including Butler County, to hold ICE detainees.

- 2 -

Kansas, complete the necessary paperwork, including the I-205, and then escort him to Kenya on a commercial airline flight.  Things did not work out as planned.

At the ICE office, Zwetow presented Waweru with the I-205.  He refused to sign it or put his fingerprint on it.  Zwetow told him refusing to provide a fingerprint was "not an option."  (R. Vol. 3 at 121, 141.)  Waweru became agitated and frustrated.  Another agent, James Gutierrez, stepped in and attempted to calmly explain to Waweru the purpose of the I-205 and the need for the fingerprint and signature.  Waweru asked to see the form.  When Gutierrez gave it to him, Waweru looked at it and started "ripping it to pieces," saying "no, no, I'm not signing it, I'm not going back" and "I'm not fucking going anywhere."  (R. Vol. 3 at 105, 134.)  He then leaped out of his seat and got into an "aggressive" "fighting stance," "which is where  . . . [he is] kind of bladed off[2] to us with his hands quickly up by his chest like he was ready to fight."  (R. Vol. 3 at 105, 151, 167.)

Zwetow and another agent immediately grabbed Waweru's arms; they, with the assistance of three other agents, took him to the ground.  Waweru "fought [the agents] all the way [to the ground]."  (R. Vol. 3 at 136.)  Waweru was handcuffed and his feet were shackled.  He was placed in a holding cell, where he told Zwetow:  "[Y]ou're a dead

---

[2] Agent Martin described the term "bladed off" as "an athletic stance where you kind of shift your weight, turn your shoulders, put your hands up like you're about ready to fight or protect your face."  (R. Vol. 3 at 107-08.)  He said the stance is used "when someone wants to fight or they're thinking about fighting."  (*Id.*)

mother fucker." (R. Vol. 3 at 135.) The trip to Kenya was canceled and Waweru was returned to the Butler County Jail.

On January 24, 2013, agents again attempted to obtain Waweru's signature and fingerprint on the I-205. It was, as Yogi Berra famously said, "déjà vu all over again." Agent Gregorio Perez presented the I-205 to Waweru, who again refused to sign it or provide his fingerprint and again said he would not go back to Kenya. True to form, he again jumped out of his chair and assumed an aggressive fighting stance with raised fists. Two agents grabbed him but he broke away, snatched the I-205, and ripped it to pieces. The agents quickly grabbed his arms a second time. Waweru resisted, kicking his feet and yelling. "The whole time he was . . . thrashing and fighting, trying to get free." (R. Vol. 3 at 197.) Waweru was eventually taken to the ground with knee strikes. But he still resisted being handcuffed by keeping his arms under his body with his hands balled into fists. His resistance was in vain; he was eventually handcuffed, his feet were shackled, and he was placed in a holding cell.[3]

Waweru was indicted with two counts of refusal to depart from the United States in violation of 8 U.S.C. § 1253(a)(1)(C) (Counts 1 and 3) and two counts of forcibly resisting, opposing, impeding, and interfering with a federal officer with the intent to

---

[3] Waweru won a pyrrhic victory—he remains in the United States, apparently in custody, awaiting his return to Kenya. According to the prosecutor's representations to the district judge, it is unlikely Waweru will be returned to Kenya on a commercial airline due to his uncooperative behavior. Rather, the government will have to return him on a "dedicated flight," which is more expensive and conducted less frequently than a commercial airline flight.

commit another felony (refusal to depart) in violation of 18 U.S.C. § 111(a)(1) (Counts 2 and 4). The jury found him guilty on Counts 2 and 4 but could not reach a verdict on Counts 1 and 3, which were dismissed without prejudice by the government.[4] The district judge decided a presentence investigation report was unnecessary and sentenced Waweru to time served on the same day the jury returned its verdict.[5] *See* Fed. R. Crim. P. 32(b), (c).

## II. DISCUSSION

As Waweru would have it, the evidence was insufficient to show he <u>forcibly</u> resisted, opposed, impeded, or interfered with the ICE agents. "Whether the government presented sufficient evidence to support a conviction is a legal question we review *de novo*." *United States v. Hernandez*, 509 F.3d 1290, 1295 (10th Cir. 2007) (quotations omitted). "[W]e view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the jury's verdict." *Espinoza*, 338 F.3d at 1146-47. "We will

---

[4] Waweru was allowed to present a necessity defense, i.e., that he faced an immediate threat of death or serious bodily injury if he was deported, to Counts 1 and 3 but not to Counts 2 and 4. In this regard, he told the jury his father was an active opponent of the ruling party in Kenya. As a result, he was taken into custody in 1998 by government officials who raped him. Two years later, government supporters came to his family's home, threatened him and his family, and sexually assaulted his mother and sister. In 2001, as his visa to remain in the United States was about to expire, his mother told him not to return to Kenya because the family was again being threatened. In 2008, his parents, brother, and two sisters were murdered due to the political unrest in Kenya.

[5] The district judge informed the parties prior to trial of his intent to sentence Waweru, if convicted, to time served so as not to further prolong the removal process. He also stated he would do so immediately after the jury announced its verdict. Neither party objected to the sentence and with good reason. The guideline range was 10 to 16 months imprisonment. At the time of trial, Waweru had already been in custody for over a year.

reverse the verdict only if no rational jury could have found [the] [d]efendant guilty beyond a reasonable doubt." *Id.* at 1147. "This is a restrictive standard of review, and it provides us with very little leeway." *Hernandez*, 509 F.3d at 1295 (quotations omitted).

Section 111(a)(1) prohibits an individual from "forcibly . . . resist[ing], oppos[ing], imped[ing], . . . or interfer[ing] with" a federal officer while engaged in the performance of his official duties.[6] The force element of the statute can be proven by either (1) actual touching or (2) a threat of immediate harm coupled with a present ability to inflict harm. *United States v. Disney*, 253 F.3d 1211, 1214-15 (10th Cir. 2001) (quotations omitted). In their testimony here, the agents involved in the events of January 7 and 24 admitted Waweru did not strike them or throw a punch at them. But that is cold comfort to Waweru as they also said he assumed a fighting stance, made threats, and resisted being handcuffed by fighting and kicking his feet.[7] Narrowing our focus, we assume, *arguendo*, that no actual touching occurred before the officers used force. Thus, the question is whether—taking into consideration the totality of the circumstances—the evidence was sufficient to show (1) Waweru's actions on January 7

---

[6] Section 111(a)(1) also penalizes one who "forcibly assaults [or] intimidates" a federal officer. Waweru was not charged with taking these actions.

[7] Waweru says he only passively resisted being handcuffed by stiffening his body (January 7) and holding his hands under his body (January 24). While Agent Gutierrez testified Waweru stiffened his body when the agents subdued him on January 7, Agent Martin testified Waweru aggressively resisted being handcuffed and Agent Zwetow echoed that sentiment, saying Waweru "fought [the agents] all the way [to the ground]." (R. Vol. 3 at 136.) Viewing the evidence in the light most favorable to the verdict requires us to conclude Waweru actively resisted being restrained on January 7.

and 24, including his taking a fighting stance, constituted a threat of immediate harm and (2) he had the present ability to inflict harm.

Not surprisingly, Waweru downplays his conduct, claiming he "only" tore the I-205, stood up, and raised his hands in a fighting stance. (Appellant's Op. Br. at 19.) Such conduct, he claims, did not create a risk of immediate harm to any agent because he made no move toward the agents, did not try to punch, strike, or hurt them, and was immediately subdued. He also claims he lacked the present ability to inflict harm because he was unarmed, outnumbered, and in the confined space of the ICE office.[8] With respect to the later argument, he confuses probable success in the imminent fight with an ability to inflict harm.

Waweru's argument is unconvincing. In deciding he acted "forcibly" the jury could reasonably have given his fighting stance significant weight. The agents testified they viewed the stance as "aggressive" not merely "defensive." (R. Vol. 3 at 156-57, 167, 207.) In other words, Waweru presented a willingness and readiness to fight. His stance, coupled with his aggressively uncooperative attitude toward being deported, could

---

[8] At oral argument the government conceded the offense ended when Waweru was secured in a cell. Waweru contends his threat to Zwetow (calling him a "dead mother fucker") cannot be considered along with his other words and acts in satisfying the force element of § 111(a)(1) because it was made after he was secured in a holding cell. Whether or not that is true, it is relevant evidence of the intensity of his anger and determination just moments before. It is also relevant in assessing the credibility of the officer's testimony about their perceptions of his behavior as threatening and their description and characterization of his behavior. We have considered it, as we must, in viewing the totality of the circumstances in the light most favorable to the jury's verdict.

objectively appear to a reasonable officer as a threat of immediate harm.[9] Certainly a jury could so find. Moreover, because Waweru was not restrained at the time he angrily ripped up the form and took the fighting stance, he undoubtedly had the present ability to carry out the threat.

Waweru seems to suggest a threat of immediate harm cannot occur until there is a fist in flight. Nonsense. Taking a fighting stance against government agents might not categorically place them at risk of immediate harm (or justify a reasonable agent's perception of such risk), but the totality of Waweru's conduct (including the fighting stance) was sufficient for this jury to have found the force element of § 111(a)(1) satisfied. *See Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1026, 1031 (10th Cir. 1997) (concluding officer reasonably feared for her safety when suspect pivoted towards her in a crouched wrestler's position with fists clenched). Waweru's being subdued before he could hit the agents does not diminish the risk of harm and cannot be considered an abandonment of his demonstrated aggression. In fact, the risk of being assaulted appears to be what led the agents to immediately subdue him.

Our decision in *United States v. Dale* is instructive.[10] 539 F. App'x 880 (10th Cir. 2013). Dale went to the clerk's office of the federal courthouse to file documents in a

---

[9] Waweru suggests the agents did not consider the fighting stance a threat to their safety because they took no precautions on January 24 to prevent a reoccurrence of the events of January 7. We decline to require law enforcement to assume the worst and we do not fault the agents for giving Waweru another chance to cooperate.

[10] Unpublished opinions are not binding precedent. 10th Cir. R. App. P. 32.1(A). We mention *Dale* because of its persuasive and reasoned analysis.

civil case. *Id.* at 881. A clerk's office employee made copies of the documents, gave the copies to Dale, and kept the originals. *Id.* Dale became agitated when the employee would not return the originals to her so she grabbed them from the clerk's office counter. *Id.* at 882. The employee's supervisor intervened. *Id.* at 881-82. Dale became very agitated and "made it clear that she felt like [the clerk's office employees] were out to get her . . . and that [they] were sabotaging her again." *Id.* at 882 (quotations omitted). Dale then began talking "very loud" and "repeatedly said she was not leaving . . . until she got exactly what she wanted, and . . . the Marshals will have to drag her out of here." *Id.* (quotations omitted). The clerk's office employees requested assistance from the U.S. Marshal's office. *Id.* A deputy marshal and a court services officer arrived and escorted Dale to the Marshal's holding area; Dale resisted the entire time. *Id.* at 882-83. Once in the holding area, Dale continued to yell loudly and began flinging her arm toward the deputy marshal, who believed she was going to hit him. *Id.* at 883. Dale was convicted of two counts of violating § 111(a)(1), one count relating to the clerk's office employees and the other as to the deputy marshal. *Id.* at 883-84. On appeal she argued the evidence was insufficient to show she acted "forcibly." *Id.* at 885. We disagreed:

> Considering all the evidence, and viewing it in the light most favorable to the government, there is sufficient evidence that Ms. Dale acted forcibly in, at a minimum, resisting, impeding, intimidating and interfering with both the employees in the Clerk's office and the Marshals. She demanded her documents back; she actually grabbed them from across the partition; she yelled at everyone, including accusing them of attempting to sabotage her case and kidnap her; and she resisted being removed from the Clerk's office and being taken to the U.S. Marshal's holding area. Both Ms. Golay and Ms. Schoonover testified they were intimidated by Ms. Dale's actions and that normal business in the Clerk's office came to a stop. Deputy Marshal Kline testified that he thought Ms. Dale was going to assault him.

*Id.* at 885.

Dale did not swing at or hit the clerk's office employees. Nevertheless, we concluded there was sufficient evidence to show they were <u>forcibly</u> intimidated by Dale due to her demanding her documents, grabbing the documents, and accusing the employees of sabotaging her case. This case presents considerably more—Waweru not only tore up the I-205 but also made clear he was not going back to Kenya (using explicit and profane language) and then raised his fists at the agents in an aggressive stance.

Finding no cases in this circuit to support his argument, Waweru turns to cases from other circuits. But they are inapposite. In *United States v. Starks*, the defendant tore up an incriminating affidavit he provided to federal agents who were investigating him for employment misconduct. 472 F.3d 466, 468 (7th Cir. 2006). Although he was acquitted of the § 111(a) charge because the jury determined he had not struck or pushed the agents, he was found guilty of obstruction due to his destroying the affidavit. *Id.* Nevertheless, in addressing a multiplicity challenge to the indictment, the Seventh Circuit concluded that merely destroying the affidavit would not render him criminally liable under § 111(a). *Id.* at 469. In *United States v. Davis*, the defendant ran from a federal officer and struggled against being handcuffed but did not punch or attack anyone during his arrest. 690 F.3d 127, 137 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 889 (2013). The court determined "there was no evidence that Davis engaged in any conduct whatsoever that demonstrated a desire to injure an agent or would cause an agent to apprehend immediate injury." *Id.* Unlike in *Starks* and *Davis*, Waweru did not simply tear up the I-

- 10 -

205 or struggle with the agents to avoid being restrained.  A jury could reasonably take his conduct, considered as a whole, to amount to "forcibly . . . resist[ing], oppos[ing], imped[ing], . . . or interfer[ing] with" a federal officer.

Finally, in *United States v. Hertular*, the defendant told DEA agents to "watch their backs" because his drug trafficking organization "would hire hit men . . . to take the agents out."  562 F.3d 433, 438 (2d Cir. 2009).  The court concluded this threat was akin to a "threat of future harm" and thus lacked immediacy.  *Id.* at 442.  In contrast, the threat in this case was of immediate harm and the later ("dead mother fucker") threat was evidence of an earlier and continuing intent to make good on the threat.

**AFFIRMED.**

**Entered by the Court:**


**Terrence L. O'Brien**
United States Circuit Judge