**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 22 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

vs.

ROGER R. GARDNER,

    Defendant - Appellant.

No. 00-4113

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 99-CR-382-K)

---

Christopher B. Chaney, Assistant United States Attorney (Paul M. Warner, United States Attorney, on the brief), Salt Lake City, Utah, for Plaintiff - Appellee.

Dixon D. Hindley, Salt Lake City, Utah, for Defendant - Appellant.

---

Before **KELLY**, **HOLLOWAY**, and **HENRY**, Circuit Judges.

---

**KELLY**, Circuit Judge.

Defendant-Appellant Roger Gardner appeals his conviction under 16 U.S.C. §§ 3372(a)(1), 3373(d)(2). Our jurisdiction arises under 28 U.S.C. § 1291, and we reverse because the jury instructions did not sufficiently instruct the jury as to how it should consider uncorroborated accomplice testimony.

Background

In the light most favorable to the government, United States v. Vallo, __ F.3d __, 2001 WL 55521, at *3 (10th Cir. Jan. 23, 2001), we summarize the evidence adduced at trial. In January 1997, Mr. Gardner was driving Dorene Arthur in her pickup truck north of Whiterocks, Utah, on Whiterocks Road near the state fish hatchery. Sometime after sunset, a herd of elk crossed in front of the truck. Mr. Gardner pulled the truck to the side of the road, retrieved Ms. Arthur's gun from the truck, and shot and killed one of the larger bulls in the herd. Mr. Gardner and Ms. Arthur then returned to Ms. Arthur's home.

In Ms. Arthur's truck, Mr. Gardner drove Laif Thornton, Ms. Arthur's son, and Ronnie Ross back to where the elk had been shot. It was disputed as to whether Ms. Arthur also returned with Mr. Gardner or remained at home. The elk was near an opening in a fence that ran along the east side of the road. Mr. Gardner, Mr. Ross and Mr. Thornton loaded the elk onto the truck. The elk had not been tagged. Eventually, either Ms. Arthur or Mr. Thornton butchered the elk, which Ms. Arthur's family later ate.

On the night of February 1, 1997, in the course of breaking up a party at Ms. Arthur's residence, a Bureau of Indian Affairs ("BIA") police officer and Uintah County Sheriff deputies discovered an untagged elk carcass in Ms.

Arthur's shed. Early the next morning, a Utah State Division of Wildlife Resources conservation officer visited Ms. Arthur's home. Mr. Thornton initially denied even the existence of the elk. After discovering the elk in the shed, the conservation officer asked if anyone had paperwork, such as a permit or tag, for the elk. Mr. Gardner, Ms. Arthur, and Mr. Thornton were present, but unresponsive to the conservation officer's inquiry. However, out of Mr. Gardner's presence and while assisting the conservation officer load the elk onto his truck, Mr. Thornton told the officer that Mr. Gardner had shot the elk. The conservation officer advised Mr. Thornton that he could be criminally charged and Mr. Thornton expressed concern that the gun and truck would be taken. Ms. Arthur told the conservation officer that her brother, Charles, had shot the elk during hunting season. At trial, Ms. Arthur did not recall having said that Charles had shot the elk.

Later that morning, the conservation officer, joined by an investigator, returned to Ms. Arthur's residence and interviewed Ms. Arthur and Mr. Thornton. Ms. Arthur and Mr. Thornton each stated that the elk was shot with Ms. Arthur's gun and transported in her truck. They also disclosed where the elk had been shot. The interviews, somewhere between thirty minutes to an hour in length, were tape-recorded and summarized in a one-page report. However, the tape was later lost. In the area where Ms. Arthur and Mr. Thornton stated the elk had been

shot, the conservation officer and investigator discovered what appeared to be elk remains. The remains were located approximately 100 yards east of Whiterock Road at the end of a trail of faint tire prints that passed through an opening in a barbed-wire fence.

After concluding that the elk had been shot on tribal land, the conservation officer and investigator turned the investigation over to the Ute Tribe Fish and Wildlife Department. In mid-February, the department's acting assistant director and a tribal fish and game officer [1] interviewed Ms. Arthur and Mr. Thornton. Ms. Arthur showed the assistant director the shed where the elk had been stored. With the assistance of the state officers' report, the tribal officers located elk remains beyond an opening in a fence on the east side of Whiterocks Road. According to the 1996-97 Ute Tribe Hunting Proclamation, elk hunting was permitted only between September 21 and October 20 during daylight. A permit and membership in the Ute Tribe were required. A carcass could be transported only by a permit holder, and only after the animal had been tagged.

On February 9 or 10, Norman Cambridge, a realty specialist with the BIA and the Uintah and Ouray Reservation, visited the location of the remains. He testified that the land on which the remains were found and the surrounding area, except for the nearby state fish hatchery, was tribal land.

_____

[1] Hereinafter collectively referred to as the "tribal officers."

- 4 -

There was conflicting testimony as to the orientation of the remains with reference to the hatchery. The conservation officer described the location as one-fifth of a mile south of the state fish hatchery; the investigator described the location as one-fifth of a mile south of the hatchery turnoff. In sharp contrast, Ms. Arthur, the BIA realty specialist, and both tribal officers testified that the location was northeast of the hatchery. The assistant director of the tribal fish and wildlife department testified that the state officers misstated the kill site location "because of the way the road runs kind of north out east." I Supp. R. at 220.

Sometime during the early hours of February 2, Mr. Gardner urged Mr. Thornton not to disclose the shooting to the authorities. On at least two occasions thereafter, Mr. Gardner told Mr. Thornton that he "should have kept [his] mouth shut." I Supp. R. at 168; see also id. at 170. In both instances, Mr. Thornton testified that he felt threatened, in part because Mr. Gardner had been drinking.

On October 18, 1999, Mr. Gardner was charged with illegally transporting, receiving and acquiring an elk taken in violation of Ute Tribe regulations, 16 U.S.C. §§ 3372(a)(1), 3373(d)(2), and attempted witness tampering. 18 U.S.C. § 1512(c)(2). After a jury trial, Mr. Gardner was found guilty of violating 16 U.S.C. §§ 3372(a)(1), 3373(d)(2) of the Lacey Act and was sentenced to nine

months imprisonment, to be followed by one year of supervised release.  Mr. Gardner was also ordered to pay a $500 fine, $750 in restitution, and a $25 victim assessment fee.  This appeal followed.

## Discussion

### A.  Jurisdiction

Mr. Gardner first argues that the district court lacked jurisdiction because the government failed to plead and prove two essential jurisdictional elements for a 16 U.S.C. § 3372(a)(1) violation—namely, that Mr. Gardner was not an Indian and that the crime affected interstate commerce.  We review issues of jurisdiction de novo.  United States v. Cuch , 79 F.3d 987, 990 (10th Cir. 1996).

As for Indian status, Mr. Gardner argues that under 18 U.S.C. § 1152 and our decision in United States v. Prentiss , 206 F.3d 960 (10th Cir. 2000), reh'g en banc granted , No. 98-2040 (10th Cir. June 19, 2000), the government was required to plead and prove that Mr. Gardner was not an Indian. [2]  We disagree. 18 U.S.C. § 1152 extends the "the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive

---

[2]  This is the same issue we addressed in Prentiss and which is currently before this court on rehearing.  We consider Prentiss as it applies to this case because the panel decision was not vacated, 10th Cir. R. 35.6; however, we need not address this issue.

jurisdiction of the United States, except the District of Columbia, . . . to the Indian country," subject to a few exceptions. Id. Because the Lacey Act is not a "general law[] of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States," 18 U.S.C. § 1152, and because 16 U.S.C. § 3372 applies to actions on state and Indian land, 18 U.S.C. § 1152 is not applicable to Lacey Act violations. United States v. Cowboy, 694 F.2d 1228, 1234 (10th Cir. 1982). Accordingly, the non-Indian status of the defendant is not an essential element of jurisdiction for a 16 U.S.C. § 3372 violation.

Mr. Gardner's argument that effect on interstate commerce is an essential element is contrary to the plain language of 16 U.S.C. § 3372(a)(1), which applies when wildlife taken in violation of tribal law is transported, received, or acquired. It is only necessary to plead and prove an interstate commerce nexus where § 3372(a)(2) is implicated. See 16 U.S.C. § 3372(a)(2) ("It is unlawful for any person—to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce—(A) any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State . . . ."). In light of this conclusion, we need not address the government's argument that Mr. Gardner did not properly object to the district court's § 3372(a)(1) jury instruction.

B.  Brady Violation

Mr. Gardner next challenges the district court's denial of his motion to dismiss under Brady v. Maryland, 373 U.S. 83 (1963). Mr. Gardner argued that the government violated Brady because it lost or destroyed the tape upon which the conservation officer and investigator's interview of Ms. Arthur and Mr. Thornton was recorded. Mr. Gardner asserted that the tape was exculpatory because Ms. Arthur stated in that interview that someone other than Mr. Gardner shot the elk.

Because the tape was lost and no longer in the government's possession, California v. Trombetta, 467 U.S. 479 (1984), and Arizona v. Youngblood, 488 U.S. 51 (1988), control. United States v. Gomez, 191 F.3d 1214, 1218 (10th Cir. 1999). Brady addresses only evidence still in the possession of the government. Id.

We review the district court's denial of the motion to dismiss for clear error. United States v. Parker, 72 F.3d 1444, 1451 (10th Cir. 1995). Having reviewed the testimony in the Brady hearing, IV R. at 5-67, and the district court's resolution of the issue, I R., doc. 72, we cannot say the district court's denial of Mr. Gardner's motion to dismiss was clearly erroneous. Mr. Gardner utterly failed to demonstrate that the tape was constitutionally material, Trombetta, 467 U.S. at 489, and, assuming materiality, that the government acted

- 8 -

in bad faith. <u>Youngblood</u>, 488 U.S. at 58. The very premise of Mr. Gardner's materiality argument—that the tape contained exculpatory evidence—is faulty. Ms. Arthur's statement, made during the conservation officer's first visit, was <u>not</u> tape-recorded. IV R. at 29-30, 33, 37-38 (<u>Brady</u> hearing); V R. at 57 (trial). In any event, that statement was tendered to the jury through the testimony of the conservation officer. Furthermore, there was no evidence that the officers acted in bad faith. The loss of the tape was, at worst, the product of negligence. <u>Youngblood</u>, 488 U.S. at 58; <u>see also</u> <u>Parker</u>, 72 F.3d at 1452 ("Mere negligence is not sufficient to establish . . . bad faith.").

## C. Mr. Gardner's Proffered Accomplice Witness Instruction

Mr. Gardner argues that the district court erred in failing to instruct the jury that it should weigh the testimony of Ms. Arthur and Mr. Thornton as that of alleged accomplices with caution and care. Mr. Gardner also makes brief reference to evidence regarding Mr. Thornton's drinking habits, but does not present an argument as to why the district court's failure to give an alcohol abuse instruction was error. We therefore only address the district court's refusal to submit the tendered accomplice witness instruction to the jury. <u>Gross v. Burggraf Constr. Co.</u>, 53 F.3d 1531, 1547 (10th Cir. 1995)

"[I]f the testimony of an accomplice is uncorroborated, the court must instruct the jury that testimony of accomplices must be carefully scrutinized,

weighed with great care, and received with caution." United States v. Hill, 627 F.2d 1052, 1053 (10th Cir. 1980) (internal quotations and citation omitted); accord United States v. Owens, 460 F.2d 268, 269 (10th Cir. 1972). Failure to so instruct the jury is "reversible error." Hill, 627 F.2d at 1055 (quoting Owens, 460 F.2d at 269). "We review an instruction de novo when an objection was made at trial," as is the case here. United States v. Wiktor, 146 F.3d 815, 817 (10th Cir. 1998). Accomplice testimony is uncorroborated "when the testimony . . . is the only testimony directly tying the defendant into the criminal transaction . . . ." United States v. Williams, 463 F.2d 393, 395 (10th Cir. 1972); accord Owens, 460 F.2d at 269.

Ms. Arthur and Mr. Thornton were accomplices. See United States v. Simmons, 503 F.2d 831, 837 (5th Cir. 1974) ("If a witness is subject to indictment as a principal or accessory to the offense for which the defendant is charged, he is an accomplice." (citations omitted)). As explained, in the course of her testimony, Ms. Arthur admitted that she witnessed Mr. Gardner shoot the elk, and there was evidence, although controverted, that Ms. Arthur went with Mr. Gardner to retrieve the elk, butchered the elk, and that her family ate the elk. Ms. Arthur also acknowledged that the elk was shot with her gun and that the elk was transported in her truck. Mr. Thornton admitted that he helped retrieve and transport the elk. Both Ms. Arthur and Mr. Thornton were aware they could be

- 10 -

criminally charged for their actions.

Ms. Arthur and Mr. Thornton's testimony was uncorroborated. While the tire tracks and elk remains near Whiterocks Road, and the elk carcass in Ms. Arthur's shed certainly "serve[d] to promote their trustworthiness," there was no evidence adduced at trial beyond Ms. Arthur and Mr. Thornton's testimony that tied Mr. Gardner to the crime.    Owens, 460 F.2d at 269.  Therefore, because Mr. Gardner's conviction was based solely upon uncorroborated accomplice testimony, a cautionary jury instruction was required.

In Hill, we held that the district court's general witness credibility instruction was not sufficiently cautionary.  627 F.2d at 1054-55.  Because the instruction submitted to the jury in this case is nearly identical in substance to the instruction submitted in    Hill,[3] and because the instruction is the only instruction

---

[3]  In Hill, the jury was instructed:

Ladies and gentlemen, you are the judges of the facts, of the weight of the evidence, and of the credibility of the witnesses.  In determining such weight or credit, you may consider the interest, if any, which a witness may have in the result of the trial, the relation of the witness to the parties, the bias or prejudice, if any has been apparent, the candor, fairness, intelligence and demeanor of the witness, the ability of the witness to remember and relate past occurrences, means of observation, and opportunity of knowing the matters about which the witness has testified.

Id. at 1054.  In this case, the jury was instructed:

Now, I have said that you must consider all of the evidence.

at all relevant to accomplice witness testimony, we must conclude that the instruction was insufficient. We need not address the other outstanding issues. We have reviewed the entire trial record and conclude that under proper instruction the evidence would have been sufficient to support a conviction for the charged offenses. See United States v. Smith, 82 F.3d 1564, 1567 (10th Cir. 1996). Accordingly, Mr. Gardner's conviction must be reversed and the case remanded for a new trial.

Reversed.

---

This does not mean, however, that you must accept all of the evidence as true or accurate.

I have already indicated that you are the sole judges of the credibility or "believability" of each witness and the weight to be given to their testimony. In weighing the testimony of the witnesses you should consider their relationship to the government or the defendant; their interest, if any, in the outcome of the case; their manner of testifying; their opportunity to observe or acquire knowledge concerning the facts about which they testified; their candor, fairness, intelligence; evidence regarding the general reputation of the witness for truth and veracity; and the extent to which they have been supported or contradicted by other credible evidence. You may, in short, accept or reject the testimony of any witness in whole or in part.

I R. doc. 76 (No. 7).