**UNITED STATES COURT OF APPEALS** December 21, 2011

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

WILLIAM BERNARD FREEMAN,

      Defendant-Appellant.

No. 11-6062
(D.C. No. 5:10-CR-00165-L-1)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **MURPHY, HOLLOWAY** and **O'BRIEN**, Circuit Judges.

Defendant-Appellant William Bernard Freeman appeals his conviction on a one-

count indictment for bank robbery in violation of 18 U.S.C. § 2113(a) and 18 U.S.C. §

2(a) (aiding and abetting the principal crime of bank robbery). On appeal, he challenges

his conviction, contending that (1) the evidence of guilt was insufficient to sustain his

conviction; (2) the district judge erred in refusing to issue a jury instruction addressing the

credibility of accomplice testimony; and (3) the district judge erred in declining to grant a

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

mistrial after the defense uncovered an alleged discovery violation by the prosecution during re-direct examination of an FBI agent who investigated the case.  The district court properly exercised jurisdiction over this crime against the United States under 18 U.S.C. § 3231.  We exercise jurisdiction over the district court's final decision under 28 U.S.C. § 1291 and affirm Mr. Freeman's conviction.

## I.  BACKGROUND

On January 21, 2010, a robbery occurred at the IBC Bank located at NW 19th Street and North Portland Avenue in Oklahoma City ("the bank").  In connection with the crime, the United States prosecuted Mr. Freeman for bank robbery and aiding and abetting on a one-count indictment.  The government elicited testimony as to Mr. Freeman's involvement in the crime from his accomplices.  The accomplices implicated Mr. Freeman as the originator of the robbery scheme and the getaway driver on the day of the robbery.  The accomplices' testimony was supported by testimony from the FBI case agent who investigated the crime, Mr. Freeman's ex-girlfriend (with whom he was in a romantic relationship at the time of the robbery), the teller whom the robbers approached, and a local police officer who had pulled over Mr. Freeman for an unrelated traffic violation long after the robbery.   As to the first issue of sufficiency of the evidence, Mr. Freeman argues that the accomplices' testimony was insufficient to support his conviction because it was inconsistent and unreliable.  Thus, we summarize the trial testimony *seriatim*.

Heather Ford, a teller present during the robbery, testified that two individuals (one male and one female) entered the bank on the morning of January 21, walked up to her

teller station, and handed her a demand note. ROA Vol. III at 63:14-19. Ms. Ford said that the robbers also gave her a pillowcase to fill with money. *Id.* at 66:9. After Ms. Ford filled the pillowcase with money from nearby cash drawers, she returned it to the robbers and they fled the bank. *Id.* at 70:24-71:1. Ms. Ford added that she believed around $14,000 had been taken from the bank during the robbery. *Id.* at 71:4.

Alexica "Shae" Hopkins testified that she had played a role in the bank robbery scheme along with Vivian Ayala, Eddie Ayala, and the defendant, William "Mac" Freeman. *Id.* at 76:11, 77:22. Ms. Hopkins acknowledged that she had entered into a plea agreement with the government and as a result hoped to receive a lower prison sentence. *Id.* at 75:6-10. She made a visual identification of Mr. Freeman as the fourth accomplice in the crime. *Id.* at 78:8. Ms. Hopkins stated that Mr. Freeman, a close friend of hers whom she had known for eight years, had organized the robbery scheme. *Id.* at 77:24, 78:14-17, 83:8, 83:16. According to Ms. Hopkins, Mr. Freeman approached her on the evening of January 20 (the day before the robbery), asking her to aid him and Ms. Ayala in a bank robbery. *Id.* at 83:14, 85:23. Later that night, Ms. Hopkins, Ms. Ayala, and Mr. Freeman agreed that Mr. Freeman would drive everyone to the bank and both of the Ayalas would enter the bank and execute the robbery. *Id.* at 86:17-18. Ms. Hopkins's role in the robbery was not established at that time. *Id.* at 87:4.

On the morning of January 21 (the day of the robbery), Ms. Hopkins said she met Mr. Freeman and both of the Ayalas at her apartment complex. *Id.* at 87:13. Mr. Freeman drove everyone to the bank in his car, a black Chevrolet Monte Carlo. *Id.* at 87:21. On the way there, Ms. Hopkins said that Ms. Ayala wrote the demand note at the

direction of Mr. Freeman. *Id.* at 88:4-5, 88:20. Ms. Hopkins acknowledged that she had helped Ms. Ayala with spelling in the note, although she did not admit actually writing the note. *Id.* at 88:23-89:1. Mr. Freeman told her to go into the bank and determine how many people were inside. *Id.* at 89:7-8. Mr. Freeman dropped Ms. Hopkins off about a block away from the Bank and she went inside pretending to be a job applicant. *Id.* at 90:1, 90:10.

Once inside the bank, Ms. Hopkins said she sent a text message to Mr. Freeman recounting her surveillance. *Id.* at 90:4-6. After the Ayalas executed the robbery, Ms. Hopkins remained inside the bank. *Id.* at 92:9-19 Although Ms. Hopkins had originally planned to leave the bank before the robbery, she was unable to get out before the police locked down the scene to question witnesses in the bank at the time of the robbery. *Id.* at 92:19, 93:17. When questioned at the bank by law enforcement, Ms. Hopkins said that she neither saw nor knew anything about the robbery. *Id.* at 94:5-12. While still in the bank, either before or during questioning, Ms. Hopkins sent a text message to Mr. Freeman telling him she had overheard a bank teller say that between $11,000 and $12,000 had been taken in the robbery. *Id.* at 94:23-95:4.

After law enforcement let her leave the scene, Ms. Hopkins contacted Mr. Freeman (she did not remember whether the communication was via phone call or text message) to pick her up. *Id.* at 93:9-11. Mr. Freeman returned in a different car, picked up Ms. Hopkins a short distance away from the bank, and drove her back to her apartment. *Id.* at 95:22, 96:4-5, 96:24. On the way back from the bank, Ms. Hopkins said Mr. Freeman told her that he was planning "to go get . . . some shoes" with his cut of the

robbery money. *Id.* at 96:19. After Mr. Freeman and Ms. Hopkins got back to the apartment complex, Ms. Hopkins said that she received $50 from Ms. Ayala for her part in the robbery. *Id.* at 97:15. During its examination of Ms. Hopkins, the government also played a recording of a phone call which Ms. Hopkins identified as being between Mr. Freeman and his mother. *Id.* at 98:22.

On cross-examination, Ms. Hopkins acknowledged that she had lied to law enforcement about her involvement in the robbery when interviewed on January 21 and when initially arrested on May 12. *Id.* at 106:6-12. Ms. Hopkins also acknowledged that the prosecutor in her criminal case would still need to take some action in order for her to reap the benefits of a plea deal she had with the government. *Id.* at 114:23-115:20.

Vivian Ayala identified herself as a friend of Ms. Hopkins and Mr. Freeman, who she knew as "Mac," and the sister of Eddie Ayala. *Id.* at 132:21, 133:6-7, 135:2-5. With regard to execution of the bank robbery, Ms. Ayala testified to the same basic scheme as did Ms. Hopkins, implicating Mr. Freeman as the organizer and getaway driver in the robbery. We recite only the arguably material inconsistent testimony and additional information provided by Ms. Ayala.

Ms. Ayala said she pled guilty as to her role in the robbery, hoping that her cooperation in Mr. Freeman's case would result in her receiving a lower sentence for her involvement with the robbery, although she had no formal agreement with the government. *Id.* at 131:18-25. She also claimed that Ms. Hopkins had written the demand note on the way to the bank. *Id.* at 141:20. She recalled that Ms. Hopkins had

been dropped off in the bank parking lot, rather than a block or so away as stated by Ms. Hopkins. *Id.* at 142:3.

Ms. Ayala said that Mr. Freeman dropped her and her brother off two houses away from the bank after receiving Ms. Hopkins's text message about the number of people inside the bank. *Id.* at 142:22-25. After the robbery, Mr. Freeman picked up her and Mr. Ayala in the bank's driveway and drove them back to Ms. Hopkins's apartment, where they counted the money they had taken from the bank. *Id.* at 144:23-24, 145:9-10. Ms. Ayala said she and her brother each received one-quarter of the money, although she did not recall knowing the total amount that had been taken. *Id.* at 146-10. It was her understanding that each of the four robbery participants would receive equal shares of the robbery proceeds. *Id.* at 146:5. She said that Mr. Freeman kept his and Ms. Hopkins's share at that time and then went to pick up Ms. Hopkins upon receiving a text message from her. *Id.* at 146:13-20. Ms. Ayala stated that she and her brother traveled to Dallas on the evening of the robbery. *Id.* at 146:23-147:7.

On cross-examination, Ms. Ayala said she had initially lied to law enforcement upon her arrest in Dallas by telling them that a black male named "Mac" had driven her and her brother to Dallas after the robbery. *Id.* at 157:9-10, 157:20-24. Contrary to Ms. Hopkins's testimony, Ms. Ayala said that she never gave Ms. Hopkins $50 for her role in the robbery, and had instead given slightly more than half the robbery proceeds to Mr. Freeman, who was to distribute to Ms. Hopkins's her one-quarter share. *Id.* at 158:21. On re-direct examination, Ms. Ayala clarified that she had told the lie about a black male driving her to Dallas in order to protect her family. *Id.* at 165:17-22.

Eddie Ayala offered testimony similar to that of Ms. Ayala. Again, we recite only the material inconsistencies and additional information. Mr. Ayala knew Mr. Freeman as "Matt" rather than "Mac". *Id.* at 176:3-9. He had only talked to Mr. Freeman about the robbery scheme on two occasions prior to the robbery. *Id.* at 176:19. He said he agreed to join in the robbery in order to protect his sister. *Id.* at 177:17-21. Like Ms. Ayala, Mr. Ayala claimed he and his sister were dropped off two houses away from the bank and returned to Mr. Freeman's car after the robbery. *Id.* at 181:22-23, 183:14-16.

On cross-examination, Mr. Ayala said that his sister had approached him about the robbery "a week or two" before it actually took place. *Id.* at 189:19-20. Mr. Ayala offered confusing testimony about when exactly he first spoke with Mr. Freeman about the robbery plan. *Id.* at 190:23-192:4. Ultimately, Mr. Ayala suggested that he had spoken with Mr. Freeman about it only once before the day of the robbery, and that conversation took place at least a week before the robbery. *Id.* at 192:11-16. Contrary to the testimony of his sister but consistent with Ms. Hopkins's testimony, Mr. Ayala testified that Mr. Freeman had dropped off Ms. Hopkins "two or three houses" away from the bank rather than in the bank parking lot. *Id.* at 193:11.

Whitney Gatlin testified that she had been in a relationship with Mr. Freeman, who she knew as "Will" and "Mac," from November 2009 until March 2010 (the robbery took place in January 2010). *Id.* at 215:5-22; 216:2-6. Ms. Gatlin said she had given Mr. Freeman a cell phone prior to January, and the phone was registered under her own name. *Id.* at 216:9-217:1. She could not recall the entire phone number for the phone she gave to Mr. Freeman. *Id.* Ms. Gatlin said Mr. Freeman used the phone she had given him

- 7 -

through March 2010 and they regularly exchanged text messages while he was using that phone. *Id.* at 217:16-24. She also said that on one occasion in the beginning of February that Mr. Freeman had purchased "two or three" pairs of shoes and "a few" jeans and shirts for himself. *Id.* at 219:9-23. He had also given her an expensive purse for Valentine's Day. *Id.* at 220:5-7. She was "a little" surprised that Mr. Freeman would have made these purchases given his ordinarily frugal spending habits. *Id.* at 219:25-220:2.

Trevor Troxell, a Moore, Oklahoma police officer, testified that in February 2010 he pulled over an individual named William Bernard Freeman for a traffic violation, although he could not make a visual identification of Mr. Freeman. *Id.* at 224:16, 225:25, 226:17. Mr. Freeman had been driving a two-door Chevrolet Monte Carlo matching Ms. Hopkins's and the Ayalas' description of the vehicle used in the robbery. *Id.* at 225:16. Upon reviewing the citation issued to Mr. Freeman, Officer Troxell stated that Mr. Freeman had given his phone number. *Id.* at 225:6. The phone number listed in the citation ultimately matched the phone number for the cell phone that Ms. Gatlin gave Mr. Freeman.

The last witness was FBI Agent Kerstetter. Agent Kerstetter testified that he was the case agent who investigated the robbery. *Id.* at 228:4. He recalled seeing Ms. Hopkins walking away from the bank and talking on a cell phone after she was released from the scene of the robbery. *Id.* at 228:25-229:20. He stated that Ms. Ayala's fingerprints had been found on the demand note used in the robbery. *Id.* at 230:25. Agent Kerstetter testified that his investigation led him and other agents to believe that

Mr. Freeman had used the telephone number 405-204-0487 ("204 Number") at and around the time of the robbery, at least through February 2010.[1]  *Id.* at 231:12-14.  Agent Kerstetter also described phone records exhibited by the government.  The records showed a multitude of text message and phone call communications between the 204 Number and Ms. Hopkins's cell phone on the morning of the robbery.  *Id.* at 233:10.  Consistent with Ms. Gatlin's testimony, the phone records for the 204 Number reflected that the number was registered in Ms. Gatlin's name.  *Id.* at 232:9.

Agent Kerstetter demonstrated that there were text messages sent to the 204 Number from Ms. Hopkins's phone at 9:36am, 9:49am, 10:27am, and 10:39am on the morning of the robbery.  *Id.* at 233:19-23, 236:8-10.  Agent Kerstetter testified that the records also revealed "several" phone calls "back and forth" between Ms. Hopkins and the 204 Number after the 10:27am text message.  *Id.* at 236:3-5.  Lastly, Agent Kerstetter identified some phone calls, excerpts of which were played for the jury.  Among other things, one call reflected the male caller telling the female caller that he and Ms. Hopkins were not "all the way" innocent.[2]  Addendum to Resp. Br., Trial Exhibit 10.  In another

---

[1] The trial transcript reveals that Ms. Ayala first linked "Mac" to the 204 Number at some point during police questioning.  Having linked an unidentified fourth suspect to the 204 Number, Agent Kerstetter or his associates searched local police records and found the Moore, Oklahoma traffic citation that Officer Troxell had issued.  Having found that citation, Agent Kerstetter tied Mr. Freeman to the 204 Number.  Later, in reviewing phone records for the 204 Number, Agent Kerstetter learned that the 204 Number had been registered with the phone company under Ms. Gatlin's name and account.  ROA Vol. III at 271:17-272:4.

[2] Earlier in the trial, Ms. Hopkins had identified the callers in this call as Mr. Freeman and his mother.

call played for the jury, Mr. Freeman asked a friend of his about the ability of law enforcement to retroactively retrieve the content of text messages sent on an earlier date.

On cross-examination, Agent Kerstetter revealed that in the excerpted phone calls Mr. Freeman had also made exculpatory statements suggesting that he was being set up, had fingers pointed at him, and was lied about by his alleged accomplices. ROA Vol. III at 278:23-279:7. Agent Kerstetter also acknowledged some inconsistency between the physical description of the fourth accomplice given by the other suspects and the physical appearance of Mr. Freeman. An issue also arose about a photograph of Ms. Hopkins's live-in boyfriend that Agent Kerstetter showed to the Ayalas before tying Mr. Freeman to the bank robbery. *Id.* at 286:18, 298:3-11. The proceedings surrounding the photograph are discussed in greater detail in Part IV.A, *infra*.

No further witnesses testified after Agent Kerstetter. The jury returned a guilty verdict. Mr. Freeman timely appealed and challenges his conviction. We consider in turn the three issues raised by Mr. Freeman on appeal.

## II. SUFFICIENCY OF THE EVIDENCE

In reviewing the sufficiency of the evidence supporting a conviction, we view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the government. *United States v. Espinoza*, 338 F.3d 1140, 1146-47 (10th Cir. 2003). This Court reviews the sufficiency of the evidence de novo. *United States v. Lewis*, 240 F.3d 866, 870 (10th Cir. 2001). We will reverse a guilty verdict only if no rational jury could have found the defendant guilty beyond a reasonable doubt. *Espinoza*, 338 F.3d at 1147.

Mr. Freeman asks us to adopt and apply a per se rule that uncorroborated testimony of accomplices is insufficient to sustain a conviction as a matter of law. Aplt. Br. at 23.[3] The Tenth Circuit has soundly and unwaveringly rejected the argument Mr. Freeman sets forth. In *United States v. Magallanez*, for example, we unequivocally held that "[a] conviction may stand merely on the uncorroborated testimony of an accomplice." *United States v. Magallanez*, 408 F.3d 672, 682 (10th Cir. 2005) (citing *United States v. McGuire*, 27 F.3d 457, 462 (10th Cir. 1994)). Mr. Freeman explicitly acknowledges and asks us to reconsider this well-settled precedent. Aplt. Br. at 26. In the absence of intervening Supreme Court authority or en banc review, we may not do so.[4] *E.g. United States v. Mitchell*, 518 F.3d 740, 752 n.14 (10th Cir. 2008).

---

[3] His argument is based on the Supreme Court's recognition that testimony of accomplices "is not to be taken as that of an ordinary witness, of good character, in a case where testimony is generally and *prima facie* supposed to be correct." *Crawford v. United States*, 212 U.S. 183, 204 (1909). *See also Bruton v. United States*, 391 U.S. 123, 136 (1968) (characterizing the incriminating hearsay statement of an accomplice as "inevitably suspect" and intolerably unreliable where the accomplice does not testify); *Cruz v. New York*, 481 U.S. 186, 195 (1987) (White, J., dissenting) (acknowledging that a codefendant's out-of-court statements are traditionally viewed with special suspicion). Problematically for Mr. Freeman, however, all these discussions of unreliability of accomplice testimony are in contexts other than the sufficiency of the evidence.

[4] In any event, we remain resoundingly persuaded by the convincing reasoning of *Magallanez*. "It is not the role of an appellate court to consider the credibility of the witnesses or weigh the conflicting evidence, as these matters are within the exclusive province of the jury." *Maganallez*, 408 F.3d at 682. If alleged accomplices might have a motive to lie in implicating a defendant, the defendant is afforded an opportunity to explore any such nefarious motives and more generally attack the credibility of government witnesses at trial. *Id.* Mr. Freeman's counsel did exactly this upon cross-examination of government witnesses and in his closing argument. And as in *Magallanez*, the jury was thoroughly instructed that it was their responsibility to determine credibility. *See* Part III, *infra*.

- 11 -

Mr. Freeman's alternative suggestion that the accomplice testimony in this specific case was incredible as a matter of fact is also unavailing. We may not usurp the jury's role as fact-finder and determiner of credibility. *Magallanez*, 408 F.3d at 682. Thus, we are precluded from passing judgment on the credibility of Mr. Freeman's accomplices unless their testimony is incredible on its face. *See United States v. Torres*, 53 F.3d 1129, 1140 (10th Cir. 1995). This limited caveat does not apply in this case. Accomplice testimony is not incredible "on its face" where the government offered independent corroboration of the accomplices' testimony via, *inter alia*, phone records and incriminating phone call recordings, and each accomplice's testimony was generally consistent with that of other accomplices.[5]

In sum, Mr. Freeman's arguments for insufficiency of the evidence merely raise issues of credibility of government witnesses rather than a claim that the government

---

[5] Mr. Freeman claims that we can override the jury's credibility determinations because his alleged accomplices told inconsistent stories, unbelievable on their face. This characterization is not supported by the record. In making out his argument, Mr. Freeman points to elements of the accomplices' testimony that were inconsistent. This recitation of bits and pieces of inconsistency is unavailing. The inconsistencies complained of by Mr. Freeman do not make the accomplices' implication of Mr. Freeman in the robbery scheme necessarily incredible. A rational juror could certainly believe that Mr. Freeman's alleged accomplices had differing recollections about the specifics of the execution of the robbery, amounts of money distributed from the robbery, and precise description of their getaway driver's physical features while still finding their testimony to be generally believable. Furthermore, the government offered ample independent corroborating evidence that supported the testimony of the accomplices.

Similarly, Mr. Freeman asks us to disregard the jury's credibility decisions because the accomplice testimony could not possibly have been believed by a reasonable juror given its "excessive purchase price." Mr. Freeman cites no legal authority to support this proposition. Regardless, the corroborating evidence offered by the government adequately resolves any concerns about the incentive for accomplices to falsely implicate Mr. Freeman resulting in inherently unbelievable testimony.

failed to carry its burden of proving an essential element of bank robbery or aiding and abetting. *See United States v. Torres*, 53 F.3d 1129, 1135, 1140 (10th Cir. 1995). We reject his claim and conclude that the evidence presented at trial was sufficient to sustain his conviction.

### III. FAILURE TO ISSUE A JURY INSTRUCTION SPECIFICALLY PERTAINING TO ACCOMPLICE TESTIMONY

#### A. Procedural Background

At the direction of the district judge, the district judge's law clerk held an off-the-record preliminary jury instruction conference with the attorneys for each party. During that meeting, Mr. Freeman's counsel submitted a written copy of an Oklahoma state court jury instruction addressing "informant testimony." The parties agreed on the rest of the instructions, but disagreed about the propriety of Mr. Freeman's proposed instruction. After the preliminary meeting, the judge held an on-the-record hearing to finalize the jury instructions.

At the formal instruction hearing, the district judge allowed Mr. Freeman's counsel to argue why the proposed state court jury instruction ought to be issued along with the other agreed upon instructions. The jury instruction sought by Mr. Freeman was labeled "Evidence – Credibility of Informers" and said:

> The testimony of an informer who provides evidence against a defendant for . . . immunity from punishment [or] personal advantage . . . must be examined and weighed by you with greater care than the testimony of an ordinary witness. Whether the informer's testimony has been affected by interest or by prejudice against the defendant is for you to determine.

ROA Vol. I at 103.

Mr. Freeman's argument before the trial judge was limited to a discussion of use of the instruction in Oklahoma state courts. Mr. Freeman's counsel even acknowledged that he was not aware of a similar instruction ordinarily used in federal court. Mr. Freeman's counsel cited no case law supporting inclusion of his proposed instruction. The district judge was unpersuaded by Mr. Freeman's argument and declined to alter the otherwise agreed-upon jury instructions. Thus, the judge denied inclusion of Mr. Freeman's proposed Oklahoma state court instruction and deemed sufficient the general witness-credibility instruction (Instruction No. 9).

**B. Standard of Review**

In this case, the parties hotly dispute whether this issue was properly preserved during the trial stage. On appeal, Mr. Freeman says the proposed "informant testimony" instruction or a similar one should have been issued. The government makes several arguments about why this issue was not preserved in the trial court. However, such arguments are moot because we find no abuse of discretion in the district court's refusal to give a particular instruction. *See United States v. Serrata*, 425 F.3d 886, 898, 900-01 (10th Cir. 2005) (reviewing for abuse of discretion a district judge's refusal to grant a proposed jury instruction). Similarly, upon de novo review of the jury instructions as a whole, we find that they accurately informed the jury of the governing law. *Id.*

**C. Adequacy of the Jury Instructions as to Accomplice Testimony**

Mr. Freeman contends that he was entitled as a matter of law to a jury instruction laying out for the jury the perils of uncorroborated accomplice testimony. And there is good reason for Mr. Freeman to suggest that such an instruction is required by the Tenth

Circuit in certain circumstances. *See, e.g., United States v. Gardner*, 244 F.3d 784, 789 (10th Cir. 2001) ("If the testimony of an accomplice is uncorroborated, the court must instruct the jury that testimony of accomplices must be carefully scrutinized, weighed with great care, and received with caution.") (quoting *United States v. Hill*, 627 F.2d 1052, 1053 (10th Cir. 1980)) (quotations omitted). Indeed, we laid out this principle nearly half a century ago in *Todd v. United States*, stating that "if the incriminating testimony of an informer is uncorroborated or unsubstantiated, special cautionary instructions are surely required." 345 F.2d 299, 300 (10th Cir. 1965). But in *Todd* we also set forth a corresponding corollary, acknowledging that such an instruction is not *necessary* where there is adequate corroboration:

> If such testimony is corroborated in critical respects, we nevertheless favor careful instructions in form and substance calculated to call attention to the character of the testimony of the informer, leaving to the jury the ultimate question of value and credibility. *There is no ritual of words*, and abstract instructions are usually beamed to the appellate court rather than to the jury. *The sufficiency of the instructions depends upon other incriminating circumstances of the case tending to corroborate the informer.*

*Id.* (emphasis added). Thus, while a specific accomplice credibility instruction is *favored* where accomplice testimony is satisfactorily corroborated, it is not *required*.

The bold, bright-line rules requiring a special accomplice testimony instruction apply only where the government's case is founded solely on *uncorroborated* accomplice testimony. In *United States v. Gardner*, we defined "uncorroborated accomplice testimony" as "the only testimony directly tying the defendant into the criminal transaction." 244 F.3d 784, 789 (10th Cir. 2001) (quoting *United States v. Williams*, 463 F.2d 393, 395 (10th Cir. 1972)). In order for Mr. Freeman's propounded rule to apply to

- 15 -

this case, Mr. Freeman needs to show that the testimony of the accomplices in this case was not "substantially corroborated." *United States v. Serrata*, 425 F.3d 886, 900-01 (10th Cir. 2005) (citing *United States v. Wiktor*, 146 F.3d 815, 816-18 (10th Cir. 1998) (per curiam)). In this regard, Mr. Freeman's efforts are sorely wanting. Indeed, in arguing that *Gardner* and *Hill* (among others) apply to this case and compelled a separate accomplice testimony instruction, Mr. Freeman fails to acknowledge the existence of corroborating evidence presented by the government.

We do not agree with Mr. Freeman's suggestion that the corroborating evidence in this case was "very limited." Aplt. Br. at 37. In so arguing, Mr. Freeman downplays without explanation the significance of the corroborating cell phone records and incriminating recordings of Mr. Freeman's phone calls. *Id.* Thus, Mr. Freeman has asked us to apply an unwavering rule requiring a special jury instructions for uncorroborated accomplice testimony without showing the essential premise — lack of corroboration.

Corroborating evidence need not be sufficient on its own in order to eliminate the requirement of a special jury instruction; instead, other evidence that has a "net effect" of "tend[ing] to corroborate" accomplice testimony is all that is needed to escape the bright-line rule requiring a special jury instruction. *United States v. Williams*, 463 F.2d 393, 396 (10th Cir. 1972) (distinguishing from *United States v. Owens*, 460 F.2d 268 (10th Cir. 1972), where corroborating evidence was offered in support of accomplice testimony); *see also United States v. Whaler*, 219 F. App'x 821, 824 (10th Cir. 2007) (unpublished) (declining to require a separate accomplice testimony jury instruction where independent evidence supported that testimony). Furthermore, accomplices may testify about matters

not addressed by other evidence so long as their testimony as a whole is substantially corroborated. *United States v. Serrata*, 425 F.3d 886, 901 (10th Cir. 2005).

In *United States v. Owens*, where this Court found plain error in failing to instruct as to accomplice credibility, the "*only* evidence" directly implicating the defendant was the testimony of his accomplices. 460 F.2d 268, 269 (10th Cir. 1972) (emphasis added). While accomplice testimony was an important component of the evidence of Mr. Freeman's guilt, his conviction was not left to stand or fall on that evidence alone. Most notably, he was tied to the scheme as described by Ms. Hopkins and the Ayalas with cell phone records. Mr. Freeman was connected to the 204 Number with statements made to law enforcement by Ms. Ayala, Ms. Gatlin's testimony, and the traffic citation issued by a local police officer. Unlike the corroborating evidence in *Gardner*, where a special instruction was required, in Mr. Freeman's case the corroboration went beyond merely adding to the trustworthiness of the accomplices who testified. *See United States v. Gardner*, 284 F.3d 784, 789 (10th Cir. 2001)

We recognize that we are reviewing the district judge's decision for abuse of discretion in contrast to some of the above-cited cases, which reviewed under the more stringent plain error standard. But that alters neither our analysis nor our conclusion. Phone records (among other things) tied Mr. Freeman to the scheme as described by confessed accomplices. Thus, we conclude that a special accomplice testimony instruction was not required.

Having determined that the district court was not required by law to issue an instruction specifically addressing accomplice testimony, we are left only to ask whether

the general witness credibility instruction satisfactorily advised the jury of the relevant law. Because Mr. Freeman fails to argue that Instruction No. 9 was lacking or misleading in some way other than not going far enough, we find no error in the final set of instructions issued to the jury.[6]

Mr. Freeman also seeks to persuade us that the instructions were deficient beyond the refusal to grant the specifically requested instruction. But these further criticisms of the jury instructions were indisputably not raised before the trial judge; therefore, we review these new challenges for plain error. *See, e.g., United States v. Smith*, 13 F.3d 1421, 1424 (10th Cir. 1994) ("[W]e review a court's failure to instruct a jury for plain error if the defendant fails to raise the contention at trial.")

Mr. Freeman first tells us that the jury should have been instructed that, "You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt." Aplt. Br. at 40. This suggested instruction has no applicability to Mr. Freeman's case because it implicates an absent premise — that the testimony of the witnesses in this case was "unsupported."

---

[6] In particular, Instruction No. 9 advised jurors to "think about the testimony of each witness you have heard and decide whether you believe all or any part of what each witness had to say, and how important that testimony was." ROA Vol. I at 81. Among the questions jurors were directed to ask themselves in evaluating witness credibility were: "Did the witness have any particular reason not to tell the truth?"; "Did the witness have a personal interest in the outcome in this case?"; and "Did the witness have any relationship with either the Government or the defense?" *Id.* To this end, Instruction No. 9 satisfactorily cautioned jurors to properly weigh witnesses' motives and incentives, including those of accomplices who offered testimony that was not fully corroborated by independent evidence.

The testimony in this case was supported by independent corroborating evidence, as established *supra*.

With regard to the second argument, Mr. Freeman says the district court also should have instructed the jury that accomplice testimony "is inherently unreliable as a class of evidence." Aplt. Br. at 40. But again, this instruction relies on a faulty premise; contrary to Mr. Freeman's protestation, it is not a "basic canon of law" that corroborated accomplice testimony is inherently unreliable. Indeed, as established in Part II, *supra*, a conviction can be sustained even when the only evidence offered is uncorroborated accomplice testimony. Thus, the district court committed no error, let alone plain error, in failing to issue these alternative jury instructions.

## IV. RULE 16 VIOLATION

### A. Procedural Background

During and subsequent to his re-direct examination, the FBI's lead case agent revealed that he had shown the Ayalas a photograph of Ms. Hopkins's live-in boyfriend at some point before Mr. Freeman came to the FBI's attention as a suspect. Ms. Hopkins's boyfriend roughly matched the generic physical description of the fourth accomplice in the robbery.[7] Each of the Ayalas quickly said that the man in the photograph was not the getaway driver, and the photograph never again came up during the investigation. Once Mr. Freeman's attorney heard this testimony, he objected, claiming that the photograph had been wrongfully withheld by the government under Federal Rule of Criminal

---

[7] The description was that the fourth accomplice was approximately 5 feet, 9 inches tall and weighed approximately 160 pounds.

Procedure 16. Mr. Freeman asked the district judge to declare a mistrial due to this alleged discovery violation.

At that point, the judge held a sidebar on the matter. After hearing the parties' arguments, the judge ultimately declined Mr. Freeman's request, noting that the photograph was not exculpatory. The judge did, however, advise the prosecution to be more exhaustive in its disclosures in the future. Even though he did not ostensibly rule on whether a Rule 16 violation occurred[8], the district judge afforded Mr. Freeman's counsel a brief period of preparation and special line of re-cross-examination questioning about the photograph. The defense attorney seized this opportunity and questioned the agent about the photograph. ROA Vol. III at 290-312, 314-19.

## B. Standard of Review

The district court's failure to grant a mistrial upon a claimed Rule 16 violation is reviewed for an abuse of discretion. *United States v. Martinez*, 455 F.3d 1127, 1129 (10th Cir. 2006) (quotations omitted). We will reverse the district court's refusal only if the decision was based on clearly erroneous factual findings, an erroneous conclusion of law, or manifests a clear error of judgment. *Id.* (quotations omitted).

## C. Rule 16 Violation and Remedy

---

[8] To be sure, the district judge did say that he did not "feel that there [had] been a violation [by] the government in turning over exculpatory material . . . ." ROA Vol. III at 312:4-9. But this statement did not explicitly express a view whether the photograph was *material* under Rule 16. Thus, we cannot find any indication in the record that the judge specifically stated his views on the threshold question whether a Rule 16 violation occurred.

Under Federal Rule of Criminal Procdure 16(a)(1)(E)(i), prosecutors are required to turn over to the defendant all evidence "material" to preparation of the defense. By its terms, Rule 16 only applies where the defendant requests disclosure. Fed. R. Crim. P. 16(a)(1)(E). But here, the government does not contend that the rule does not apply to this case, so we assume the defendant made a proper discovery request whose scope encompassed the photograph in question.[9]

Mr. Freeman has a colorable claim that the government violated Rule 16 in failing to disclose the photograph. But we need not worry about that threshold question, because even if the government did violate Rule 16(a)(1)(E)(i) by failing to turn over the photograph, the district court did not abuse its discretion in declining Mr. Freeman's request for a mistrial. Thus, we skip analysis of the threshold question whether a Rule 16 violation occurred.

The text of Rule 16 offers trial courts a host of discretionary remedies for discovery violations. *See* Fed. R. Crim. P. 16(d)(2). These remedies include an order requiring the prosecution to permit the defendant to inspect the undisclosed evidence, granting a continuance, prohibiting introduction of the undisclosed evidence, and "any other order that is just under the circumstances." *Id.* Granting a mistrial would have fallen under the last category of remedies. *See United States v. Martinez*, 455 F.3d 1127,

---

[9] While the discovery rule expounded in Rule 16 is a reflection of the constitutional due process right established in *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."), Mr. Freeman's brief devotes only one sentence to *Brady*.

1130 (10th Cir. 2006) (citing *United States v. Crouthers*, 669 F.2d 635, 641 (10th Cir. 1982)). In allowing a extra line of cross-examination of the agent regarding the undisclosed photograph, the district court granted a remedy for the alleged discovery violation. ROA Vol. III at 310-11. We conclude that Mr. Freeman was not entitled to a mistrial and the district court appropriately cured the alleged discovery violation.

When the government commits a Rule 16 violation, the district court is advised to take several factors under consideration before fashioning a remedy for the violation. *Martinez*, 455 F.3d at 1130. The district court should consider (1) the reasons for the failure to produce the evidence in question; (2) the extent of the prejudice as a result of the failure to produce; and (3) the feasibility of curing any prejudice with a continuance. *Id.* Upon application of these factors, the district court is instructed to impose "the least severe sanction" that results in compliance with the discovery requirements of Rule 16. *Id.* (quoting *United States v. Wicker*, 848 F.2d 1059, 1061 (10th Cir. 1988)).

Our careful review of the trial transcript reveals that the district court considered appropriate factors upon learning of the potential Rule 16 violation. As to the first factor, the district judge said that the government was "a little lax in [its] responsibilit[y]" to turn over the photograph. ROA Vol. III at 312. While this statement implies some degree of fault on the part of the government, it indicates no willful wrongdoing. Indeed, defense counsel expressly acknowledged that he "[did] not believe the . . . United States Attorney . . . has held anything back from me." ROA Vol. III at 293-94. The defense went on to say "I believe [the prosecution] [has] been extremely forthright and candid in their disclosures to [the defense]." *Id.* Thus, the reason for the failure to produce the evidence

in question was a careless mistake at worst and does not weigh in favor of the drastic remedy of a mistrial.

As to the second factor — extent of prejudice — the district judge said no exculpatory information had been withheld because there was no information indicating that the individual in the photograph was involved in the crime. *Id.* at 311. In other words, there was at most minimal prejudice because the undisclosed information was not exculpatory. On appeal, Mr. Freeman specifically attacks the district judge's conclusion as to the extent of the prejudice suffered, stating that earlier disclosure of the photograph would have "greatly altered" his "defense strategy, theories, process, research, and representation as a whole." Aplt. Br. at 44-45. We hold that the district judge did not reach a clearly erroneous factual finding in deciding that the photograph was non-exculpatory. While it may be true that Mr. Freeman's counsel might have presented a different defense if he had known about the photograph, Mr. Freeman does not and cannot show that the photograph tended to establish his innocence in any way. Further, Mr. Freeman did not actually suffer any prejudice as a result of the inability to offer a different defense based on knowledge that the police had shown the photograph to the Ayalas. To support his argument, Mr. Freeman tells us he might have suggested to the jury that Ms. Hopkins' live-in boyfriend (the individual in the photograph) was the real culprit in the bank robbery. But this would not have benefitted him, because no evidence tied the boyfriend to the crime. Thus, we do not find clearly erroneous the district court's factual conclusion that Mr. Freeman suffered minimal prejudice as a result of the alleged Rule 16 violation.

And as to the third factor, although the district judge did not specifically address the feasibility of granting a continuance, he granted the defendant's only requested alternative remedy (further questioning of the case agent) after deciding there was no cause for a mistrial. ROA Vol. III at 312. This represented the full extent of the alternative remedy requested by Mr. Freeman. Thus, it operates as the functional equivalent of a continuance in this case.

Giving proper deference to the factual findings of the district court, we are left with no doubt that the remedy granted ably qualified as "the least severe sanction" to achieve compliance with the government's discovery obligations. *Martinez*, 455 F.3d at 1130 (quoting *Wicker*, 848 F.2d at 1061). Thus, the district court did not abuse its discretion in declining to grant a mistrial for the alleged Rule 16 violation.

## V. CONCLUSION

We **AFFIRM** Mr. Freeman's conviction.

**IT IS SO ORDERED.**

ENTERED FOR THE COURT

William J. Holloway, Jr.
Circuit Judge

- 24 -